UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NILO JEREZ,

            Plaintiff,

     v.

THE REPUBLIC OF CUBA, FIDEL
CASTRO RUZ, Individually and as
President of the State and Council of
Ministers, Head of the Communist Party and
Commander-in-Chief of the Military, RAUL
CASTRO RUZ, Individually and as First
Vice President of the Head of the Cuban
Revolutionary Armed Forces, THE CUBAN
REVOLUTIONARY ARMED FORCES,
and EL MINISTERIO DEL INTERIOR,

            Defendants.

Miscellaneous Action No. 09-466 (RWR/AK)

## MEMORANDUM OPINION

This matter was referred to the undersigned Magistrate Judge by the Honorable Richard

W. Roberts, pursuant to Local Civil Rule 72.2, for resolution of all pending motions in the

above-captioned case. (Order of Referral to United States Magistrate Judge, January 19, 2010

Minute Order.)   Pending before this Court are the  following motions: 1) Third-Parties' Motion

to Vacate Writ of Attachment on Judgment with Prejudice [10]; 2) Plaintiff Nilo Jerez's Motion

for an Order to Show Cause as to Why a Writ of Attachment Should Not be Issued against

Agencies and Instrumentalities of the Republic of Cuba and its Co-Defendants [48]; 3) Camara

de Comercio's Proposed Motion to Vacate Plaintiff's Writ of Execution with Respect to the

Republic of Cuba's Registration of its Certification Mark for Cuban Cigars [61] [1] and 4) Motion by Camara and Third-Parties Requesting the Court's consideration of an Additional Jurisdictional Argument [104]. The Court held a hearing on three motions [10, 48, 61] on July 19, 2010. Upon careful consideration of the arguments presented and for reasons set forth below, the Court finds that the Plaintiff's Writ of Attachment is not enforceable and should be vacated. An appropriate Order accompanies this Memorandum Opinion.

This Memorandum Opinion also addresses supplementation of the Court's record. Since the July 19, 2010 hearing, the Plaintiff, Third-Parties and Intervener Camara del Comercio ("Camara") have filed a multitude of documents, some of which are recorded on the Court's docket as "Supplemental Authority."[2] More specifically, the parties have filed seven "supplements" to the record, and these "supplements," have in turn resulted in additional filings such as motions for leave to file the supplements, oppositions to the supplements, replies to the oppositions, and a motion to strike a reply, with an accompanying opposition and reply to the

---

[1]This Motion should be titled and will be treated as "Camara de Comercio's proposed Motion to Vacate Plaintiff's Writ of *Attachment* with Respect to the Republic of Cuba's Registration of its Certification mark for Cuban Cigars" (emphasis added) because Plaintiff's proposed Writ of Execution was withdrawn in favor of a Writ of Attachment.

[2]This includes the following series of documents: 1) [71] Notice of Supplemental Authority filed by Plaintiff; [72/73] Supplemental Authority filed by Third-Parties and Camara, along with a motion for leave to file, which was opposed by Plaintiff at [74] with the reply docketed at [77]; 2) [78] Supplemental Authority filed by Third-Parties and Camara, with a reply [79] by Plaintiff and motion for leave to file a response thereto [80] by Third-Parties and Camara, opposition to the motion for leave docketed at [81] with the reply at [83]; 3) [84] Supplemental Authority by Plaintiff, motion for leave to file a response by Third-Parties and Camara [85] with Supplemental Authority docketed at [87], Plaintiff's opposition to the motion for leave at [89] and the reply thereto at [90], motion to strike the reply at [97], opposition to motion to strike at [98], and reply at [99]; 4) [91] Notice of Supplemental Authority by Plaintiff, response thereto at [92], and reply at [95]; and 5) [93] Notice of Supplemental Authority by Plaintiff, with a response thereto at [94] and reply at [96].

motion to strike.

Fed. R. Civ. P 15(d) controls supplementation of pleadings, where pleadings are defined by Fed. R. Civ. P. 7(a) to include complaints and third-party complaints; answers to complaints, counterclaims and cross claims; and if ordered, a reply to an answer.  Courts also have the discretion to determine whether parties are allowed to supplement the record of a case.  Having reviewed the series of "supplements" propounded by Plaintiff, Third-Parties and Camara, the Court finds that the only "supplements" that should be permitted are [84] Supplemental Authority by Plaintiff and [87] Supplemental Authority by Third-Parties and Camara, which involve two legal decisions post-dating the July 2010 hearing.  The remaining "supplements" address cases that were decided prior to the July 2010 hearing and issues that were raised in the three motions and at the oral hearing on those motions, or the "supplements" follow up on Supplemental Authority in [84] and [87].  This Court neither requested additional briefing nor authorized any additional briefing and accordingly the documents docketed at [71], [72], [78], [91] and [93] should be stricken from the record.

## I. Background

The pending miscellaneous action involves enforcement of a default judgment issued by the United States District Court for the Southern District of Florida (hereinafter, the "Florida U.S. District Court") in the amount of $200,000,000.00 in damages, plus interest in the amount of $49,424,647.00, in favor of Plaintiff Nilo Jerez ("Jerez") against the named Defendants therein: The Republic of Cuba; Fidel Castro Ruz; Raul Castro Ruz; The Cuban Revolutionary Armed Forces and El Ministerio Del Interior.  The Florida U.S. District Court's default judgment gave full faith and credit to an earlier Florida state court judgment awarding Jerez 50 million

dollars in compensatory damages and 150 million dollars in punitive damages against the same

Defendants. Because the Defendants challenge the jurisdiction of the Florida courts, this Court

will provide a detailed description of the judicial proceedings that preceded the filing of the

miscellaneous action in this Court.

On September 15, 2005, Jerez filed his Complaint in the Circuit Court of the Eleventh

Judicial Circuit in and for Miami-Dade County, Florida (hereinafter, the "Florida state court")

requesting compensatory and punitive damages against the aforementioned Defendants. In his

civil action captioned *Jerez v. Republic of Cuba et al.*, Case No. 05-18719 CA9, Eleventh

Judicial Circuit In and For Miami-Dade County, Florida, the Plaintiff alleged that he had been

subjected to tortious and torturous acts committed by Defendants and persons operating under

their direction and/or control. The named Defendants did not respond to the Complaint nor did

they appear in court at any time, including during the one day non-jury *ex parte* "trial" held in

the Florida state court on January 30, 2007.

On that same date, the Florida state court entered its Final Judgment (Motion to Vacate

Writ of Attachment [10-2], Exh. B [January 30, 2007 Final Judgment]) finding the Defendants

liable under the Torture Victim Protection Act, 28 U.S.C. §1350. The Florida state court noted

that it acquired "jurisdiction over the claims asserted by Mr. Jerez pursuant to the Alien Tort

Claim[ ] Act, 28 U.S.C. [§1350] and 28 U.S.C. §1331. . . ." (January 30, 2007 Final Judgment at

1-2.)[3] The state court's Final Judgment addressed the physical and mental torture suffered by

_____

[3]Jerez has not indicated why he elected to bring his civil action in a state court rather than
a federal court when he claimed jurisdiction under the Alien Tort Claims Act ("ATCA"), 28
U.S.C. §1350, a federal statute that provides district courts with original jurisdiction of "any civil
action by an *alien* for a tort only, committed in violation of the law of nations or treaty of the
United States." 28 U.S.C.§1350 (emphasis added). Jerez also claimed federal question

-4-

Plaintiff during his incarceration in Cuba and the psychiatric and physical damages resulting

therefrom, including Plaintiff's Hepatitis C infection. The Florida state court did not address or

reference the Foreign Sovereign Immunities Act, 28 U.S.C. §§1330, 1602 *et seq.,* which applies

to claims against foreign states, their political subdivisions, and their agencies and

instrumentalities.

Jerez subsequently moved to enforce his Florida state court Final Judgment by filing a

Complaint, on December 9, 2008, in Florida U.S. District Court, in a case captioned *Jerez v.*

*Republic of Cuba*, Case No. 08-23405- CIV- Hoveler (S.D. Fla.). The Florida U.S. District

Court Clerk's Office entered a default against the Defendants after they failed to respond to the

Complaint and that default was followed by entry of a Final Default Judgment Granting Full

Faith & Credit to State Judgment ("Final Default Judgment")(attached to Registration of Foreign

Judgment [1] at [1-1])) on May 6, 2009. In its Final Default Judgment, the Florida U.S. District

Court did not address the Florida state court's subject matter jurisdiction to enter a final

judgment nor did it undertake any independent examination of Plaintiff's case. The Final

Default Judgment was granted pursuant to 28 U.S.C. §1738, giving full faith and credit and

federal recognition to the Florida state court's Final Judgment[4] dated January 30, 2007, which

awarded Plaintiff two hundred million dollars in compensatory and punitive damages against the

---

jurisdiction, pursuant to 28 U.S.C. §1331, which provides that district courts have original
jurisdiction of "[a]ll civil actions arising under the Constitution, laws, or treaties of the United
States." *See* Reply to Opposition to Motion to Vacate [37-12] Exh. M, Part 1 [Florida state court
Complaint ¶2.]

[4]There is no other activity reflected on the Florida U.S. District Court's docket except for
the aforementioned events.

Defendants.[5]

On September 1, 2009, Jerez registered his Final Default Judgment ([1]) in this Court, pursuant to 28 U.S.C. §1963, and moved for a Writ of Execution on Judgment to acquire any "personal property located within the District of Columbia against the defendants and their agencies and instrumentalities. . . ."[6] (Motion for Order to Issue Writ of Execution on Judgment [2] at 1.) A corrected application for an Order to Issue Writ of Execution on Judgment was filed on September 2, 2009. (Corrected Application for Order to Issue Writ of Execution on Judgment [3].) Also on September 2, 2009, Jerez filed in this Court an application for a Writ of Attachment on Judgment ([4]) requesting that the Clerk of the Court issue a Writ of Attachment on Judgment for the personal property, goods and chattels of the named Defendants and their agencies and instrumentalities listed on Schedule A.[7] (Application for Writ of Attachment on

---

[5]The Florida state court awarded punitive damages against all named Defendants. The Florida state court Final Judgment does not reference any statutory authority for its award of punitive damages.

[6]The Final Default Judgment registered in this Court named as Defendants: the Republic of Cuba; Fidel Castor Ruz, Individually and as President of the State and Council of Ministers, Head of the Communist Party and Commander-in-Chief of the Military; Raul Castro Ruz, Individually and as First Vice President of the Head of the Cuban Revolutionary Armed Forces; The Cuban Revolutionary Armed Forces; and El Ministerio Del Interior. Plaintiff's Motion for Order to Issue Writ of Execution on Judgment [2], corrected by [3] and later withdrawn, listed 57 patents and 44 trademarks assigned to over 20 Cuban entities alleged by the Plaintiff to be agencies and instrumentalities of the Republic of Cuba. Defendant Republic of Cuba was listed as an assignee of only one trademark.

[7]On that same date, September 2, 2009, the Plaintiff filed an Application for a Writ of Execution in the United States District Court for the Eastern District of Virginia, following the September 1, 2009 registration of the foreign judgment in that jurisdiction. This Court references the proceedings in the Eastern District of Virginia because the two District Courts are simultaneously addressing writs relating to the Republic of Cuba's registration of its certification mark for Cuban cigars, although the proceedings in Virginia have been stayed pending determination in this Court. According to the United States Patent and Trademark Office ("USPTO") website, the USPTO is an agency of the Department of Commerce with its

Judgment [4]; Schedule A.)  Schedule A listed 24 entities allegedly related to Defendant, Republic of Cuba.  On October 1, 2009, Plaintiff withdrew his Motion for Order to Issue Writ of Execution of Judgment [2], corrected by [3], (Withdrawal of Motion [6]), and on the following day, a Writ of Attachment on Judgment was issued by the Clerk's Office to the United States Marshal for the District of Columbia.

On November 4, 2009, Plaintiff filed a Notice  of Service of Writ of Attachment on Judgment [7] indicating that he had, through a private process server, served the Writ of Attachment on Judgment on the United States Department of Commerce ("Commerce").[8] According to the parties, no action was taken by Commerce regarding the service of the Writ of Attachment.  On November 19, 2009, approximately 20 of the entities listed in Plaintiff's Schedule A filed a Motion to Vacate the Writ, which is one of the three motions pending before this Court. (Motion to Vacate Writ of Attachment [10].)  On November 25, 2009, Camara del Comercio ("Camara") filed a motion to intervene in the present proceeding. (Motion to Intervene by Camara [13].)[9]  Jerez opposed both of these motions. (Plaintiff's Opposition to [10], docketed at [25] & Opposition to [13], docketed at [26].)

The instant case was assigned to the Honorable Richard W. Roberts in January 2010, and

_____

headquarters in Virginia.

[8]Plaintiff's proceeding in the U.S. District Court for the Eastern District of Virginia involves the United States patent and Trademark Office ("USPTO"), which is an agency of the Department of Commerce with its headquarters in Virginia.  *See* USPTO website at: www.uspto.gov.

[9]Camara de Comercio (Camara) is the approximate Cuban equivalent of a "chamber of commerce." Part of Camara's function is managing, inspecting and overseeing, on behalf of the Republic of Cuba, the application and use of the National Warranty Seal relating to Cuban cigars.  (Camara's Memorandum of Points and Authorities in Support of Motion to Intervene [13] at 8.)

thereafter referred to this Magistrate Judge for resolution of all motions.  On April 14, 2010, after considering the record in this case, this Court issued a Memorandum Order quashing the Writ of Attachment issued by the Clerk's Office on grounds that the Writ was inconsistent with the Florida U.S. District Court's Final Default Judgment because it was not limited to the Defendants named therein. (April 14, 2010 Memorandum Order [43].)  The Court permitted Plaintiff to apply for a Writ of Attachment consistent with the original Final Default Judgment, which would list only the named Defendants.  Jerez filed a corrected Application for Writ of Attachment on April 15, 2010. (Application for Writ of Attachment by Nilo Jerez [44].)

On May 6, 2010, the Court convened a status conference to ascertain the nature of the asset(s) Plaintiff intended to attach because the proposed Writ of Attachment on Judgment [44] did not specify what "personal property, goods and chattels" Plaintiff sought to attach. (*See* Transcript of Proceedings from May 6, 2010 [54].)  During the status conference, Plaintiff's counsel identified the only "asset" at issue as the trademark (Serial No. 72153423) registered in the United States for the National Warranty Seal ( "the Seal" or "the Mark") on Cuban Cigars, which is assigned to the Republic of Cuba.[10]  Counsel for Camara was present at the hearing even though its motion to intervene had not yet been granted.  Besides the Seal, no other assets were identified in connection with the Defendants named in the default judgment; however, just prior to the status conference Plaintiff Jerez filed his Motion for an Order to Show Cause As to Why a Writ of Attachment Should not be Issued Against the Agencies and Instrumentalities of the Republic of Cuba and Its Co-Defendants [48], and that is the second motion pending before

---

[10]The trademark is also identified by Registration No. 756,558. ([13] at 2.)

this Court.[11]

The named entities, the alleged agencies and instrumentalities, filed their response on May 20, 2010. (Opposition to Motion for Order to Show Cause [52].)  In that response, seventeen of the entities appeared to have conceded that for purposes of the proceeding in this Court they were, in fact, agencies and instrumentalities of the Republic of Cuba; however, five of the entities filed a separate opposition to the Motion for Order to Show Cause indicating that they did not concede and should not be considered agencies and instrumentalities of the Republic of Cuba. ([Second] Opposition to Motion for Order to Show Cause [53].)

On June 4, 2010, the Clerk of the Court issued a Writ of Attachment on Judgment for the personal property, goods and chattels of the Defendants named in the default judgment that was obtained in the Florida state court and certified by the Florida U.S. District Court.  (Writ of Attachment on Judgment [58].)  On June 18, 2010, this Court issued a Memorandum Order granting Camara's motion to intervene. (Memorandum Order granting motion to intervene [59].) On that same date, Camara filed a proposed Motion to Vacate Plaintiff's Writ [of Attachment] with Respect to the Republic of Cuba's Registration of its Certification Mark for Cuban Cigars (Motion to Vacate Plaintiff's Writ [61]), which is the third motion pending before this Court.

A telephone status conference was held on June 25, 2010, during which the seventeen entities affirmed their status as agencies and/or  instrumentalities of the named Defendants (these entities are hereinafter referred to as "the Agencies/Instrumentalities") and five entities continued to dispute that they were agencies and/or instrumentalities of Cuba.  This Court

---

[11]If the Writ of Attachment is held to be enforceable against agencies and instrumentalities of the Republic of Cuba and the other Defendants, Plaintiff intends to attach the trademarks and patents assigned to these entities that were identified in the withdrawn Motion for Writ of Execution.

subsequently issued a Memorandum Order (June 30, 2010 Memorandum Order [64]) listing the entities and identifying their status, and setting a July 19, 2010 hearing on the Third-Parties' Motion to Vacate the Writ [10]; Plaintiff's Motion for Order to Show Cause as to Why a Writ of Attachment Should Not be Issued ([48]); and Camara's Motion to Vacate Plaintiff's Writ ([61]).[12]

The essence of the three motions require the Court to rule on two issues – the jurisdiction of this Court to enforce the default judgment entered by the Florida state and federal court and execution of the Writ of Attachment. Because the relief requested and the arguments asserted by the Plaintiff, Camara and the Agencies/Instrumentalities overlap, this Court's ruling will initially address the Florida courts' jurisdiction to enter the default judgment, a prerequisite for this Court's jurisdiction to enforce the default judgment and then address whether this Court can enforce the Writ of Attachment.[13]

## II. Does this Court have Jurisdiction to Enforce the Judgment of the Florida U.S. District Court, which in turn granted Full Faith and Credit to the Judgment of the Florida State Court?

### A. Subject Matter Jurisdiction

Although Camara and the Agencies/Instrumentalities (collectively referred to as "Movants") and the Plaintiff focus on enforceability of the judgment, relying on the Terrorism Risk Insurance Act of 2002, ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002),

---

[12] A ruling on the status of those five entities was deferred until the Court ruled on the issue of enforcement of the Writ of Attachment. ([69] at 3.)

[13] The Court notes that some of the issues presented in the three motions are now moot in light of the fact that Plaintiff's original Writ of Attachment was quashed; the Writ was subsequently amended; and 17 entities have conceded that they are agencies or instrumentalities for purposes of these proceedings.

codified at 28 U.S.C. §1610 note,[14] this Court will initially address the issue of jurisdiction. It is necessary to first review the underlying subject matter jurisdiction of the two Florida courts, primarily because the record does not indicate that the Florida state court or Florida U.S. District Court considered the Foreign Sovereign Immunities Act ("FSIA"). The Florida state court did not affirmatively find that there was an applicable waiver of immunity under FSIA for the entry of the Florida state court Final Judgment, and the Florida U.S. District Court subsequently granted Full Faith and Credit to that Final Judgment.

If the Florida state court's reliance on statutes prevented it from acquiring subject matter jurisdiction, then its Final Judgment would not be enforceable and its lack of jurisdiction cannot be cured by a second court giving it Full Faith and Credit. These are basic principles historically recognized by the Supreme Court:

> To be sure, the structure of our Nation as a union of States, each possessing equal sovereign powers, dictates some basic limitations on the full-faith-and-credit principles enumerated above. Chief among these limitations is the caveat, consistently recognized by this Court, that "a judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment." *Durfee v. Duke*, 375 U.S. 106, 110 (1963). Consequently, before a court is bound by a judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given. *Nevada v. Hall*, 440 U.S. 410, 421 (1979).

*Underwriters Nat. Assur. Co. v. N.C. Life and Acc. and Health Ins. Guaranty Ass'n*, 455 U.S. 691, 704 ( 1982).

Preliminarily, it should be noted that subject matter jurisdiction may be raised at any

---

[14]TRIA generally provides that blocked assets of a terrorist party are subject to execution or attachment in aid of execution to satisfy a judgment.

time, even by the court *sua sponte*.[15]  *See generally* Fed. R. Civ. P. 12 (h)(3) ("If the court

determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the

action.") *See G. Keys PC/Logis NP v. Pope*, 630 F.Supp.2d 13, 15 (D.D.C. 2009) ("When it

perceives that subject matter jurisdiction is in question, the Court should address the issue *sua

sponte*.") (citations omitted.)  "[R]esolving a merits issue while jurisdiction is in doubt 'carries

the courts beyond the bounds of authorized judicial action[.]'"  *In Re Papandreou*, 139 F.3d 247,

254-55 (D.C. Cir. 1998)  (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 84

(1998)).[16]

A case relied upon by both Plaintiff and Movants, which discusses jursidictional issues,

and which is factually similar to the case at bar, is *Weininger v. Castro*, 462 F. Supp.2d 457

(S.D.N.Y. 2006).  In *Weininger*, plaintiff Weininger received a default judgment against the

Republic of Cuba, Fidel Castro, Raul Castro and the Army of the Republic of Cuba, and the

plaintiff McCarthy received a default judgment against the Republic of Cuba.   These judgments

resulted in an award of compensatory damages by the Circuit Court for the Eleventh Judicial

Circuit in and for Miami-Dade County.[17]  Weininger attempted to domesticate her Florida state

court judgment by seeking summary judgment in a New York state court but that action was

---

[15]The Court accordingly does not address Plaintiff's argument that Movants and Camara do not have standing to challenge the subject matter jurisdiction of the Florida state court.

[16]In the instant case, Plaintiff correctly argues that his judgment against the Defendants is "entitled to full faith and credit if there's no constitutional infirmity" such as lack of subject matter jurisdiction or jurisdiction over the person (July 19, 2010 Hearing Transcript [82] at 27, lines 4-14); however, the Movants argue that neither court had  subject matter jurisdiction and that "th[is] Court has the obligation to examine the jurisdiction of the foreign court which issued the judgment that is to be enforced, and it's an independent examination because the first court was a default court." (July 19, 2010 Hearing Transcript [82] at 71, lines 1-10.)

[17]Plaintiff Weininger brought a claim relating to her father's death, after he was killed by Cuban soldiers during events surrounding the Bay of Pigs invasion.  Plaintiff McCarthy's claim related to her husband's execution by a Cuban firing squad.

removed to a district court in New York, where the judgment was given full faith and credit and a writ of execution was issued.

McCarthy brought an action on her Florida state court judgment in the Florida U.S. District Court, and a final default judgment was entered in her favor. McCarthy subsequently registered that federal judgment with the United States District Court for the Southern District of New York, which authorized issuance of a writ of execution for McCarthy to levy upon the Republic of Cuba's property in New York in order to satisfy her judgment. The property Plaintiffs sought to levy included JPM Chase bank accounts "represent[ing] deposit debts owed to 'agencies and instrumentalities' of the Republic of Cuba." *Id.* at 464.

The *Weininger* court acknowledged that while it needed to determine whether any statutory exception to immunity from execution applied before permitting execution; i.e., whether TRIA was applicable, the court would first consider the question raised by Chase [and the Cuban Electric Company, which filed an *amicus* submission] relating to enforcement of the Florida state court judgment, based on allegations of lack of subject matter and personal jurisdiction under the FSIA. The *Weininger* court noted that:

> It is beyond question that this Court must satisfy itself that it has jurisdiction to rule on any question it needs to decide that resolves the merits of a dispute.
>
>     \*       \*       \*
>
> What makes this case unique is the question of the extent to which such inquiry into the Court's own subject matter jurisdiction should encompass probing further back in the jurisdictional chain to examine the authority of a prior court, the judgment of which this Court is called upon to authorize execution, especially where, preceding the matter before this Court, other courts took intermediate actions that recognized or assumed the validity of the underlying judgments without review of the subject matter jurisdiction of the court which rendered the judgments.

*Id.* at 468.

In *Weininger*, the U.S. District Court for the Southern District of New York (the "New

York U.S. District Court") noted that while a defaulting party's collateral attacks on a prior court's jurisdiction are routine, in this case, the jurisdictional question was raised by a third party *amicus* and a garnishee [Chase] seeking to obtain interpleader relief. 462 F.Supp.2d 468-69. The New York U.S. District Court then observed that there had already been two levels of review, first by the Florida state courts, which "held hearings, took evidence, satisfied themselves of their jurisdiction and expressly so ruled" [and] . . . in the *McCarthy* case, [by] a Florida federal district court h[olding] that the state court judgment was entitled to full faith and credit." 462 F.Supp.2d at 469. In plaintiff McCarthy's case, the Florida U.S. District Court "made an implicit determination of jurisdiction - both its own and the state court's - and found the judgment entitled to be enforced." *Id.* The New York U.S. District Court further noted that in plaintiff *Weininger's* case, it had "granted summary judgment in lieu of complaint recognizing the Florida judgment [and] finding it entitled to full faith and credit. . . ." 462 F. Supp.2d at 469. The *Weininger* court concluded that "[u]nder these circumstances, the policies and principles underlying res judicata doctrine would make it manifestly inequitable for this Court to reopen the judgments so as to permit a challenge to the underlying adjudication at the request of parties not affected by judgments, . . . ." *Id.* at 469.

After making those observations, the *Weininger* court engaged in an analysis of application of the Full Faith and Credit Doctrine. The New York U.S. District Court found that "in assessing whether to enforce a state court judgment, a federal court must engage in a two-step inquiry." *Weininger*, 462 F.Supp.2d 457, 471 (citation omitted). Under the first step, "the court is obliged to enforce the judgment only to the extent that the courts of the rendering state would be similarly bound." (*Id.*) The second step requires recognition that the full faith and credit principles are subject to some limitations, namely, that "before a court is bound by the

judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign

court's decree [and] [i]f that court did not have jurisdiction over the subject matter or the

relevant parties, full faith and credit need not be given." *Id.* at 471 (citing *Underwriters*, 455 U.S.

at 705; *McCloud*, 1991 WL136027, at *5).

"[A] judgment is entitled to full faith and credit - even as to questions of jurisdiction-

when the second court's inquiry discloses that those questions have been fully and fairly litigated

and finally decided in the court which rendered the original judgment." *Durfee v. Duke*, 375 U.S.

106, 111 (1963).  In contrast, a court need not give "preclusive effect to the state judgment on

issues of subject matter jurisdiction" where "neither the judgment nor the [remainder of the] state

[court] record indicates that the state court decided or even considered any questions of subject

matter jurisdiction."  *A.L.T. Corporation v. Small Business Administration*, 801 F.2d 1451, 1460

n.17 (5th Cir. 1986).

This Court is confronted with the same dilemma as the *Weininger* court.  Plaintiff told

this Court that the Florida "state court Complaint referenced 16[05 (a)](7) as an exception [to

sovereign immunity],"(*See* Transcript of July 19, 2010 motions hearing [82] ("Hearing

Transcript") at 28:18-20); however, this was not correct and Plaintiff later clarified that the court

"did not specifically mention . . . 1605(a)(7) but it did find facts and its finding of facts supports

jurisdiction under 1605(a)(5) or 1605(a)(7)."  (Hearing Transcript at 28, lines 22-25; 29, lines 1-

2.)  Plaintiff further acknowledged that the state court "did rely and did cite to the Alien Tort

Act" but "it would be error to say that is the foundation for its jurisdiction, because you need an

exception to sovereign immunity to find jurisdiction, . . . .") (Hearing Transcript at 33, lines11-

16.)

In reviewing the record, this Court concludes that the instant case is distinguishable from

*Weininger* in that the Florida state court in the instant case did not look to the Foreign Sovereign Immunities Act as a preliminary basis for its acquiring jurisdiction nor was there any discussion of applying an exception to that Act to waive immunity even though this is an essential prerequisite when a plaintiff sues a foreign sovereign. Furthermore, the Florida U.S. District Court did not examine the Florida state court's basis for jurisdiction or make any independent determination of its jurisdiction, instead it relied solely on the Full Faith and Credit doctrine.

### B. Basis for Jurisdiction of the Florida courts

Plaintiff's Complaint in the Florida state court alleged violations of The Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. §1350, note), which allows lawsuits seeking redress for acts of torture.[18] The TVPA provides "an explicit cause of action for U.S. citizens, as well as aliens, against 'a[n] individual who, under actual or apparent authority, or color of law, of any foreign nation,' subjects an individual to torture or extrajudicial killing." *Aries v. Dyncorp*. 517 F. Supp.2d 221, 226 (D.D.C. 2007) (citing 28 U.S.C. §1350, note, §2). A TVPA claim however does not provide the court with subject matter jurisdiction. Jurisdiction could vest under either the Alien Tort Claims Act ("ATCA"), 28 U.S.C. §1350, or federal question, 28 U.S.C. §1331. *See Arndt v. UBS AG*, 342 F.Supp.2d 132, 141 (E.D.N.Y. 2004) (The TVPA is not a jurisdictional statute; rather, it allows parties to pursue claims of official torture under jurisdiction conferred by the ATCA and general federal question) (citations omitted). The terms of the TVPA make clear however that "its applicability is limited to suits against individuals, not foreign states. . . Moreover, the legislative history of the TVPA clearly shows that Congress did not intend for it to be used to hold foreign

---

[18]The Florida state court Final Judgment found the Defendants "liable for their conduct under both domestic and international law, including but not limited to the [TVPA] . . . " (Final Judgment at 1-2), without identifying the international law or domestic law it was relying upon.

states and their instrumentalities liable." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, No. Civ. A.02-02026 (HHK), 2006 WL 2384915 *11 (D.D.C. 2006); *see* 28 U.S.C. §1350 note. *See also Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101 (9th Cir. 1990) ("It is generally recognized that a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly.")[19]

In a suit involving a foreign state, a plaintiff must satisfy the court's subject matter jurisdiction under the Foreign Sovereign Immunities Act, ("FSIA"), 28 U.S.C. §§1330, 1602, *et seq.*, before the court can reach claims under the Alien Tort Claims Act, 28 U.S.C. §1350. *See, e.g., Gutch v. Federal Republic of Germany*, 444 F.Supp.2d 1,7 (D.D.C. 2006), *cert. denied*, 129 S.Ct. 114 (2008); *Soudavar v. Islamic Republic of Iran*, 67 Fed. Appx. 618, 619-20 (D.C. Cir. 2003); *Saltany v. Reagan*, 886 F.2d 438, 440-41 (D.C. Cir. 1989), *cert. denied*, 495 U.S. 932 (1990). *See also Nikbin v. Islamic Republic of Iran*, 471 F.Supp.2d 53, 58-59 (D.D.C. 2007) (The Foreign Sovereign Immunities Act "provides the sole basis for obtaining jurisdiction over a foreign state in a United States court.") (citing 28 U.S.C. §1330; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)); *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citation omitted). Relying on the Alien Tort Claims Act as grounds for jurisdiction does not waive sovereign immunity; rather, an exception under the FSIA must be applied in every action involving a foreign sovereign defendant. "There is no authority for the proposition that the TVPA or the ATCA or any other statute trumps or preempts the FSIA." *Belhas v. Ya'alon,* 466 F.Supp.2d 127, 132 (D.D.C. 2006).

---

[19] The Supreme Court further has held that the standards of liability and defenses vary depending on the capacity in which an individual is sued. *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985). The foreign sovereign immunity defense is only available to an individual sued in his official capacity while the defense of qualified immunity may only be asserted by an individual sued in his personal capacity. *Id.*

Section 1608 of the Foreign Sovereign Immunities Act provides in relevant part that "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. §1608(e). Even if a foreign state does not enter an appearance to assert an immunity defense, the court still must determine that immunity is not available under the FSIA. *Von Dardel v. Union of Soviet Socialist Republics*, 736 F.Supp.1, 4 (D.D.C. 1990). *See Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) ("[A] court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant.") *See also Abur v. Republic of Sudan*, 437 F Supp 2d 166, 171 (D.D.C. 2006) ("[A] court cannot overlook a potential defect in its jurisdiction simply because the parties fail to call it to the Court's attention.") Nor may a court "presume the existence of jurisdiction in order to dispose of a case on other grounds." *Tuck v. Pan American Health Org.*, 668 F.2d 547, 549 (D.C. Cir. 1981) This independent obligation means that the court must satisfy itself that it possesses jurisdiction to rule on the merits of the claim.

The Florida state court set out the factual background for its Final Judgment by discussing the torts and acts of torture that were inflicted upon Jerez during the 1970's[20] while he was unlawfully incarcerated in Cuba and then continuing again during his confinement in a "psychiatric hospital." ( Final Judgment at 2-4.)[21] That court also listed the psychiatric and

---

[20]The TVPA ten year statute of limitations applies to claims under the ATCA. *Doe v. Islamic Salvation Front*, 257 F. Supp.2d 115, 118-119 (D.D.C. 2003) Plaintiff's counsel acknowledged the applicability of the statute of limitations but noted that it is an affirmative defense that was not raised. (Hearing Transcript at 32, lines 22-25; 33, lines 1-10.)

[21]The Florida state court identified Eriberto Mederos as the "person primarily responsible for the administration of torture, . . . ." (Final Judgment at 5.) Mederos was convicted by a federal jury in Miami, Florida in 2002, and during his trial, the jury "heard the testimony of

physical injuries suffered by Jerez, which included, *inter alia*, post traumatic stress disorder, major depression, and "[h]epatitis C which has progressed to cirrhosis of the liver and in all probability will result in a diminished lifespan." (*Id.* at 4.) At the time of the torts and acts of torture, including Plaintiff's alleged incarceration and mistreatment by the Cuban government and his commitment to a psychiatric hospital for political reasons, Jerez was a Cuban citizen, residing in Cuba.[22]

Plaintiff's Complaint in the Florida state court stated that his civil action involving claims for tort and torture was "made by an alien" (Complaint [37-12] ¶4) and that [at the time of the Complaint] he was a "resident alien" residing in Miami-Dade County, Florida. (Complaint ¶7). The Florida state court affirmatively stated that it relied upon the Alien Tort Claims Act ("ATCA"), 28 U.S.C. §1350 and 28 U.S.C. §1331 (federal question) as grounds for jurisdiction over the claims asserted by Mr. Jerez; thus, the court accepted as true Plaintiff's representation that he was an alien when the acts of torture occurred. (Final Judgment at 2.)[23]

Plaintiff's Florida state court Complaint alleged that the Defendants were "not immune from suit pursuant to 28 U.S.C. §1605(a)(7) or any other applicable international agreements" but failed to otherwise reference the standard for waiver of sovereign immunity. (Florida state

---

witnesses, including Jerez, whom Mederos tortured at Mazorra, all of whom detailed their torture including forced drug injections and the administration of electric shocks." (Final Judgment at 6.) Mederos was not named as a defendant by Plaintiff Jerez.

[22]Plaintiff's Florida state court Complaint alleged numerous acts of tort and torture that occurred in Cuba. Plaintiff's Complaint did not specify any acts of tort and torture that occurred in the United States although he did state that "[a]s a result of the physical and mental torture NILO JEREZ suffered at the hands of the Castro regime, Jerez has been left with numerous long term injuries and illnesses, including Hepatitis C, . . . ." (Florida state court Complaint ¶31.)

[23]For purposes of the ATCA, the term "alien" means any person not a citizen or national of the United States. 8 U.S.C. §1101(a)(3). If Plaintiff was not an alien, the Alien Tort Claims Act would not apply because the ATCA requires that a claim for commission of a tort in violation of the law of nations or treaty of the United States must be made by an alien.

court Complaint ¶3.)  In contrast, Plaintiff's Complaint in the Florida U.S. District Court generally referenced the "FSIA" several times, even asserting that the basis of jurisdiction for the state court's Final Judgment was the "Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §1605(a)(7) arising out of the Cuban Defendants extra-judicial torture of Plaintiff . . . ."  (Florida U.S. District Court Complaint ¶1.)  This statement about the Florida state court's jurisdiction was inconsistent with the state court's Final Judgment, which did not mention the FSIA or any exceptions thereto in its discussion of jurisdiction, relying instead upon the ATCA..

Reliance on the ATCA for jurisdiction is misplaced when a waiver of sovereign immunity is a prerequisite.  Under section 1604 of the FSIA, unless a FSIA statutory exception to immunity applies, a foreign state is immune from the jurisdiction of federal or state courts.[24] Accordingly, the Florida state court could have acquired subject matter jurisdiction in the civil action filed by Jerez against Cuba *only if* one of the FSIA statutory exceptions to immunity

_____

[24]There is no dispute that Defendants The Republic of Cuba, The Cuban Revolutionary Armed Forces, and El Ministerio Del Interior  are foreign states pursuant to the FSIA, where a "foreign state' is defined to include both a "political subdivision of a foreign state or an agency or instrumentality of a foreign state. . ."  28 U.S.C. §1603(a).  The statute further defines an agency or instrumentality of a foreign state to be any entity:

(1) which is a separate legal person, corporate or otherwise; and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. §1603 (b).  Defendants Fidel and Raul Castro Ruz were sued individually and in their capacity as political figures.  "[A]n individual can qualify as an agency or instrumentality of a foreign state." *Belhas v. Ya'alon*, 515 F3d 1279, 1283 ((D.C. Cir. 2008), citing *El-Fadl*, 75 F.3d at 671 (internal quotations omitted); *Chiudian v. Phillipine National Bank*, 912 F.2d 1095, 1101-03 (9th Cir. 1990).  An agency or instrumentality of a foreign state includes "[i]ndividuals acting in their official capacities[;]" however, such official is not entitled to immunity under the FSIA for acts which are not committed in an official capacity.  *Jungquist v. Sheikh Sultan Binkhalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997).

applied. Similarly, the Florida U.S. District Court's jurisdiction to grant full faith and credit to the Florida state court's Final Judgment was contingent upon the express finding by the Florida state court of an exception to FSIA immunity. *See* 28 U.S.C.§1604[25]; 28 U.S.C.§1330(a).[26]

Contrary to the representations in his Florida state court Complaint, when Plaintiff filed his Complaint in the Florida U.S. District Court, to enforce the Florida state court judgment, Plaintiff stated that "*at all times material hereto*, [Plaintiff was [a] national[] of the United States of America and resident[ ] of the state of Florida." (Complaint at ¶4, emphasis added.)[27] Furthermore, during the July 19, 2010 oral hearing, Plaintiff's counsel stated on the record that "[Jerez] became a U.S. citizen when he arrived in this country, which I believe was the early '80s, and I can find out the exact date, but he was a U.S citizen when he walked into that courtroom in Dade County [Florida]." (July 19, 2010 Hearing Transcript [82] at 31, lines 2-14.) This inconsistency in the record [whether Jerez was an alien, national or citizen at the time of the torture/tortious acts] not only bears on jurisdiction under the Alien Tort Claims Act[28] but it also

---

[25]28 U.S.C. §1604 provides in its entirety:
> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act[,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

[26]28 U.S.C. §1330(a) provides, in its entirety:
> The district courts shall have original jurisdiction without regard to amount of controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605-1607 of this title or under any applicable international agreement.

[27] The Immigration and Nationality Act defines a "national of the United States" as either "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. §1101(a)(22).

[28]*See Chavez v Carranza*, 407 F. Supp.2d 925, 930 (W.D. Tenn. 2004) (citing 28 U.S.C. §1350 and stating that the Alien Tort Claims Act "creates jurisdiction in the United States courts

factors into applicability of the two exceptions to foreign sovereign immunity being claimed by

Plaintiff: FSIA §1605(a)(5) or §1605(a)(7).[29]

## C. Application of FSIA to Plaintiff's Claims

In the matter pending before this Court, Plaintiff Jerez alleges that he relied upon the

exception to FSIA provided in 28 U.S.C. §1605(a)(7) as a basis for subject matter jurisdiction in

both the Florida courts.[30]  *See* Florida state court Complaint ¶3 (alleging that the Defendants

_____

only for non-citizen plaintiffs who sue a defendant in tort for a violation of international law");
*Miner v. Begum*, 8 F. Supp.2d 643, 644 (S.D. Tex. 1998) (holding that the district court does not
have federal jurisdiction of an ATCA claim brought by United States citizens.)

[29]Plaintiff argues that either of these exceptions applies to waive sovereign immunity,
although only Section 1605(a)(7) was referenced by Plaintiff in his Florida Complaints.  In
January 2008, Congress amended the FSIA by repealing 28 U.S.C. §1605(a)(7) and enacting a
superseding provision, *see* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No.
110-181, 122 Stat. 3, 338-44 (2008), 28 U.S.C. §1605A, which includes much of the same
language and expands upon the repealed §1605(a)(7) by creating an express private right of
action against state sponsors of terrorism, allowing for awards of punitive damages and
attempting to ease the difficulty of collecting FSIA judgments by giving plaintiffs entitlement to
impose liens on property belonging to states sponsors of terrorism.  *Ben-Rafael v. Islamic
Republic of Iran*, 718 F. Supp.2d 25, 29 (D.D.C. 2010). District Courts retain jurisdiction over
cases based on §1605(a)(7) jurisdiction that were already pending prior to the repeal of the
statute. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840-41 (D.C. Cir. 2009) (citations
omitted.  In *Oveissi*,  the Court of Appeals discussed the ruling in  *Simon v. Republic of Iraq*, 529
F.3d 1187, 1190 (D.C. Cir. 2008), *rev'd on other grounds sub nom. Republic of Iraq v. Beaty*,
—U.S. —, 129 S. Ct. 2183, 173 L.Ed.2d 1193 (2009) and stated that "[b]ecause the plaintiff has
not attempted to refile his case under §1605A, we have no occasion to consider whether he can
allege claims under that section.  Instead, doing as <u>Simon</u> says, we retain jurisdiction and
consider this suit pursuant to §1605(a)(7), the section under which it was filed."  573 F.3d at
840-41.  Section 1605(a)(5) provides an exception to sovereign immunity in cases in which
money damages are sought "against a foreign state for personal injury . . . occurring in the Unites
States and caused by the tortious act or omission of that foreign state or of any official . . .  of
that foreign state while acting within the scope of his office or employment. . . ." 28 U.S.C.
§1605(a)(5).

[30]Before it was repealed in January of 2008, 28 U.S.C. §1605(a)(7) provided:
> (a) A foreign state shall not be immune from the jurisdiction of courts of the
> United States or of the States in any case-. . .
>> (7) not otherwise covered by paragraph (2), in which money damages are
>> sought against a foreign state for personal injury or death that was caused
>> by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking,

were "not immune from suit pursuant to 28 U.S.C. §1605(a)(7) or any other applicable international agreements."); *see also* Florida U.S. District Court Complaint ¶10 (alleging that "[t]he Florida State Court had subject matter jurisdiction over the underlying action pursuant to the FSIA") and ¶11 (alleging that "[t]he Cuban Defendants [were] not entitled to immunity from this action pursuant to the FSIA, because the [Florida state court] Final Judgment was rendered as a result of acts of extra-judicial torture by the Cuban Defendants.")  Plaintiff proffered no explanation for the applicability of Section 1605(a)(7) in his Florida Complaints, other than these broad self-serving allegations.

Assuming *arguendo* that Plaintiff could get past the hurdles of having relied on the ATCA for jurisdiction in the Florida state court when Plaintiff was not an alien but instead was a United States national (July 19, 2010 Hearing Transcript [82] at 31, lines 2-14); and assuming further the Florida state court's failure to reference the FSIA in its determination of jurisdiction

---

or the provision of material support or resources (as defined in section 2339A of title 18) for such act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, of agency, except that the court shall decline to hear a claim under this paragraph–

(A) if the foreign state was not designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. §1271) at the time the act occurred, unless later so designated as a result of such act or the act is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia; and

(B) even if the foreign state is or was so designated, if-

(i)the act occurred in the foreign state against which the claim has been brought and the claimant has not afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration; or

(ii) neither the claimant nor the victim was a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when the act upon which the claim is based occurred.

was not fatal to the Florida state court acquiring jurisdiction, Plaintiff's status as a national would only satisfy one of the requirements of 1605(a)(7), *if he was a national of the United States when the act upon which the claim is based occurred.*

The Florida state court's Final Judgment found as a fact that Plaintiff suffered personal injury as a result of acts of torture that occurred in Cuba. Plaintiff acknowledges that many of the acts of torture alleged in his Florida state court Complaint occurred in Cuba, when he was a Cuban citizen. Plaintiff asserts however that a waiver of sovereign immunity under [former] Section 1605(a)(7) applied to his Florida state court action because a "terrorist act occurred in th[e] [Dade County] courtroom as it did in this courtroom, which is the replication of this disease [Hepatitis], and the destruction of cells every single day, in his body." (Hearing Transcript at 31, lines 9-23)[31] Plaintiff argues that "Hepatitis C is an ongoing attack [and as such,] [i]t supplied subject matter jurisdiction to the [Florida] courts." (Hearing Transcript at 36, lines 4-7.)[32]

Plaintiff alleges that he was "purposely subject[ed] . . . to Hepatitis C infection[,]" which arose from forced drug injections [in Cuba] and resulted in cirrhosis of the liver [in the United States.] (Hearing Transcript at 34, lines 10-25; 35, lines 1-25; 36, lines 1-7.) Plaintiff further asserts that: "It's an identifiable event. Cirrhosis of the liver, which [I'm] now suffering from, is an identifiable injury, separate from the initial injection or subjection to hepatitis C, in the same

---

[31]Plaintiff asserts that the Florida state court specifically reached a decision that the Plaintiff was infected with Hepatitis C (which resulted from torture in Cuba). (Hearing Transcript at 44, lines 14-24; Final Judgment at 4.) Plaintiff argues that, "compounded" in the state court's Final Judgment was the conclusion that "each detonation [of the virus] is a measurable event attacking a United States National." (Hearing Transcript at 45, lines 1-23.) The Florida state court judgment in this case did not address Section 1605(a)(7) nor did it focus on Plaintiff's Hepatitis C, other than noting that it was one of many physical illnesses and injuries suffered by Plaintiff as a result of his torture in Cuba.

[32]According to the Plaintiff's counsel, Plaintiff was unaware of his Hepatitis C until after he came to the United States. (Hearing Transcript at 37, lines 11-14.)

way that lung cancer is a separate and distinct injury from addiction to smoking." (Hearing Transcript at 47, lines 2-7.)[33] Plaintiff claims that he has been subjected to "biological warfare" (Hearing Transcript at 31, lines 20-25; 32, line 1) while a citizen of the United States.[34]

Plaintiff relies upon a medical opinion by Lennox Jeffers, M.D. ("Dr. Jeffers"), his physician since February 1999.[35] The Court notes that Dr. Jeffers' Affidavit was not presented to the Florida state court. It was prepared, after the two judgments in the Florida courts, in connection with the proceeding in this Court. Further, Dr. Jeffers' conclusion does not establish causation between the forced injections in the 1970's, Plaintiff's Hepatitis C infection, Plaintiff's diagnosis of cirrhosis of the liver in 1998, and his claim that the Hepatitis C continues to replicate in his body to date.

According to the Plaintiff, because that "entire tort occurr[ed] here [in the United States]" and "the entire injury occurr[ed] here[,]" Cuba's sovereign immunity was waived pursuant to

---

[33]This separation of injuries contradicts the Florida state court's Final Judgment linking Hepatitis C with cirrhosis of the liver, wherein it was noted that Plaintiff had contracted "Hepatitis C which has progressed to cirrhosis of the liver and in all probability will result in a diminished lifespan." (Florida state court Final Judgment at 4.).

[34]During the hearing, Plaintiff argued that "the torts and torture suffered by Mr. Jerez, while they did occur in Cuba, also started and finished again in the United States." (Hearing Transcript at 30, lines 16-25; 31, line1.)

[35]In his December 11, 2009 Affidavit [25-6] (Exh. F), Dr. Jeffers stated that it was his medical opinion that "[Plaintiff's] cirrhosis was caused by hepatitis C" ([25-6] ¶6) and this was based on the information conveyed by Plaintiff, namely, that he was "injected with hepatitis C by Cuban government officials" in 1970 or 1971. ([25-6] ¶7.) Dr. Jeffers assumes that "Mr. Jerez was knowingly and purposefully subjected to the conditions that infected him with hepatitis C while incarcerated by the Cuban government." ([25-6] ¶9 .)

Section 1605(a)(5) as well as (a)(7).[36]  (Hearing Transcript at 46, lines 18-20.)  *But see Coleman v. Alcolac, Inc.*, 888 F. Supp. 1388, 1401-02 (S.D. Tex. 1995) (veterans of the Persian Gulf War who sued a Chinese company [deemed to be an agency/instrumentality of a foreign state] relating to their exposure to chemical and biological weapons overseas could not rely upon the commercial activity exception to the FSIA even though the plaintiffs continued to suffer the effects of such exposure in the U.S. [and claimed secondary consequences to their families at home].)  Physical suffering and consequential damages were deemed "insufficient to constitute a 'direct effect in the United States' for purposes of abrogating sovereign immunity."  888 F. Supp. at 1402 (quoting *Zernicek v. Brown and Root, Inc.*, 826 F.2d 415, 418 (5th Cir. 1987), *cert. denied sub nom., Zernicek v. Petroleos Mexicanos*, 484 U.S. 1043 (1988)).   Nor could the plaintiffs in *Coleman* rely upon the FSIA exception in Section 1605(a)(5) since the "plaintiffs [did] not plead facts indicating that the entire tort occurred in the United States. . . ."  888 F. Supp. at 1403.  *See also Princz v. Federal Republic of German*, 26 F.3d 1166, 1173 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1121 (1995) (noting that "courts applying the FSIA have uniformly rejected the argument that a personal injury suffered overseas produces a direct effect in the United States when the injured person later returns home.")

Movants contend that Plaintiff's theories regarding disease replication and biological warfare were neither presented to nor considered by the Florida state court.  This Court agrees. The record in this case reflects that the Plaintiff, through his Complaint and testimony at trial, indicated that he was subjected to forced drug injections and contracted Hepatitis C, which

---

[36]Plaintiff further argues that Cuba's continuous failure to advise Plaintiff of the presence of the virus in his body falls within the §1605(a)(5) exception to the FSIA because this tort of omission  occurred in the United States.  (Hearing Transcript at 37, lines 3-14.)  Plaintiff points to no evidence that Defendant The Republic of Cuba knew that Plaintiff had contracted Hepatitis C and concealed this fact.

resulted in cirrhosis of the liver.  *See* Florida state court Complaint ¶29 ("Regular torture

sessions included forced drug injections and electro-shock . . . "); ¶31 ("As a result of the

physical and mental torture NILO JEREZ suffered at the hands of the Castro regime, Jerez has

been left with numerous long term injuries and illnesses, including Hepatitis C. . ."). While the

Florida state court made a single reference to "forced drug injections" in its Final Judgment,

(Final Judgment at 6), and mentioned "Hepatitis C which has progressed to cirrhosis of the liver"

when it identified a laundry list of psychiatric and physical injuries that Mr. Jerez suffered (*id* at

4), the court did not engage in any discussion about torts or acts of torture that occurred while

Plaintiff was a national of the United States. Accordingly, this Court finds that Plaintiff's

theories relating to acts of torture occurring while Plaintiff was a U.S. national resulting from

replication of hepatitis or "biological warfare" are too speculative to rely on 1605(a)(7), which

requires the victim to be a national of the United States at the time the acts of torture occurred.[37]

Plaintiff's Complaint in the Florida state court focused on inhumane and torturous acts

that occurred in Cuba, while Jerez was a Cuban citizen, and these acts supported Plaintiff's

TVPA claims and ATCA jurisdiction, which the Florida state court relied upon in its Final

Judgment to support a finding of liability.[38] Those same acts of torture and tortious acts would

---

[37]Section 1605(a)(7) further requires that Cuba was designated as a state sponsor of terrorism at the time the torturous acts occurred, which would have been during the 1970's. Because Cuba was first added to the State Department's list of states sponsoring international terrorism in 1982, pursuant to Section 6(j) of the Export Administration Act of 1979 (P.L. 96-72), this requirement has not been met. Pursuant to Section 1605(a)(7), Cuba must have also been afforded a reasonable opportunity to arbitrate the Plaintiff's claim and there is no evidence of this.

[38]In a case involving TVPA claims by multiple plaintiffs, the plaintiffs who were aliens took jurisdiction under the Alien Tort Statute (sometimes referred to as the ATCA), 28 U.S.C. §1350, and the plaintiffs who were U.S. citizens proceeded under the Antiterrorism Act ("ATA"), 18 U.S.C. §2333. *Abecassis v. Wyatt*, Civil Action No. H-09-3884, 2010 WL 2671576 *1 (S.D. Tex. June 30, 2010). The ATA provides that "[a]ny national of the United States injured in his person, . . . by reason of an act of international terrorism, . . . may sue therefor in

not support a waiver of sovereign immunity pursuant to Section 1605(a)(7) (requiring that

Plaintiff be a U.S. national at the time of such acts) or pursuant to Section 1605(a)(5) (requiring

that the tort and injury occur in the United States.)[39]  *See Asociacion de Reclamantes v United*

*Mexican States*, 735 F. 2d 1517,1525 (D.C. Cir. 1984)(finding that the Torts Exception does not

apply unless "the entire tort" occurred in the United States; i.e., "the tort, in whole must occur in

the [U.S.]") (citation omitted); *Von Dardel v. Union of Soviet Socialist Republics*, 736 F.Supp.1,

8 (D.D.C. 1990); *see also O'Bryan v. Holly See*, 556 F.3d 361, 382 (6th Cir. 2009)( where the

U.S. Court of Appeals for the Sixth Circuit "join[ed]the Second and D.C. Circuits in concluding

that in order to apply the tortious act exception, the 'entire tort' must occur in the United

States.").  The *O'Bryan* court noted that its position was consistent with the Supreme Court

decision in *Amerada Hess Shipping*, 488 U.S. at 441, and concluded that "it seems most in

keeping with both Supreme Court precedent and the purposes of the FSIA to grant subject matter

jurisdiction under the tortious activity exception only to torts that were entirely committed within

the United States.  556 F.3d at 382.[40]

---

any appropriate district court of the United States . . . ." 18 U.S.C. 2333(a). "While the District of Columbia Circuit has yet to rule on whether §2337 [suits against government officials] precludes claims against foreign states that are being sued based on §1605(a)(7) jurisdiction, other members of this Court have held that §2337(2) bars a §2333 claim." *V.Z. Lawton v. Republic of Iraq*, 581 F. Supp.2d 43, 46 (D.D.C. 2008) (string cite omitted).

[39]Plaintiff, citing the Full Faith and Credit Act, 28 U.S.C. §1738, argues that *res judicata* or issue preclusion settles whether Plaintiff's claim comes within the Section 1605(a)(7) exception because federal courts should give the same preclusive effect to state court judgments as those judgments would be given in the courts of the state from which they came. *See Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 466 (1982).  This argument assumes that the Florida state court considered a waiver of sovereign immunity when it entered its Final Judgment; however, the record in this case contradicts that assumption.

[40]A failure to advise (another theory of liability noted by Plaintiff) would be deemed to have occurred in Cuba also. *See O'Bryan,* 556 F.3d at 387 ( a claim cannot survive against the defendant for its failures to warn persons in the United States because such tortious conduct would have occurred abroad.)

While it is accurate to say that 28 U.S.C. §1605(a)(7) was referenced by Plaintiff in his Florida Complaints, neither the Florida state court nor the Florida U.S. District Court made any reference to FSIA and the waiver of sovereign immunity in their judgments. Instead, the state court focused on the acts of torture and tortious acts that occurred in Cuba while Jerez was a citizen of Cuba, without determining whether Plaintiff, when he filed suit, was a U.S. national or an alien. If the Florida state court had found as a fact Plaintiff was an alien, it could have satisfied the standard for ATCA jurisdiction. The Florida U.S. District Court appears to have adopted the state court's conclusions ostensibly without any independent inquiry.[41] Accordingly, this Court finds that the Plaintiff's Florida state court judgment, which was given full faith and credit by the Florida U.S. District Court and registered in this Court, is unenforceable because the Florida state court that entered the Final Judgment did not have subject matter jurisdiction over the Defendants pursuant to an exception to sovereign immunity set forth in FSIA Section 1605(a)(5) or (a)(7).[42]

### III. Enforcement of the Judgment

Assuming *arguendo* that the Florida state court had subject matter jurisdiction to enter its Final Judgment and that Final Judgment was thus entitled to full faith and credit by the Florida U.S. District Court, this Court would still have to determine the enforceability of the Writ of

---

[41]The District Court's Final Default Judgment consists of a few short paragraphs indicating that Plaintiff's state court Final Judgment was awarded full faith and credit and federal recognition. That court also calculated post-judgment interest on the underlying judgment. (*See* Final Default Judgment.)

[42]Personal jurisdiction is established whenever subject matter jurisdiction exists and service of process has been made in accord with Section 1608 of the FSIA. 28 U.S.C. §1330(b) (1976). Both forms of jurisdiction thus turn on whether a foreign state is entitled to sovereign immunity and the dispute comes within an exception to that immunity. The Court, having concluded that the Florida state court did not have subject matter jurisdiction, finds that the issue of effectiveness of service of process need not be addressed herein.

Attachment, which is the subject of the pending motions.  In the instant case, the Movants argue that the Writ of Attachment is not enforceable because the Cuban Assets Control Regulations ("CACR")[43] prohibit all "transactions involv[ing] property in which [Cuba], or any national thereof, has . . . any interest of any nature whatsoever, direct or indirect. . . [,]" except as "specifically authorized by the Secretary of the Treasury . . . by means of regulations, rulings, instructions, licenses, . . . ."  31 CFR § 515.201(b).  The Treasury Department's Office of Foreign Assets Control ("OFAC"), headed by the Secretary of the Treasury, administers the CACR and is responsible for licensing the attachment or execution of property in satisfaction of Plaintiff's judgment.  Plaintiff has not proffered any evidence that OFAC has licensed the Writ.

The CACR thus requires denial of enforcement of the Plaintiff's Writ unless there is a applicable statutory exception to the prohibition against transactions involving unlicensed attachments.  The FSIA provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter."  28 U.S.C. §1609.  The Plaintiff relies upon the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, § 201, 116 Stat. 2322, 2337 (2002) ("TRIA") (codified as a note to 28 U.S.C. §1610) to provide an exception to the CACR's prohibition against enforcement of the Writ of Attachment.[44]

_____

[43]The Cuban Assets Control Regulations, 31 CFR Part 515 (1963), are implemented under the Trading With the Enemy Act of 1917, 40 Stat. 411, as amended, 50 U.S.C. App. §1 *et seq.*; *see* 28 Fed. Reg. 6974 (1963).  The Trading with the Enemy Act ("TWEA"), 50 U.S.C. §5(b), gave the President authority to impose comprehensive embargoes on foreign countries as a means of dealing with  peacetime emergencies and times of war.  *Regan v. Wald*, 468 U.S. 222, 225-26 (1984).

[44] Plaintiff asserts that no OFAC license is required for attachment of the trademarks and patents because TRIA applies.  (Jerez Opposition to Third-Parties' Motion to Vacate [25] at 48.)

## A. TRIA

TRIA, Section 201(a), provides as follows:

(a) IN GENERAL- Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of Title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Movants argue however that Plaintiff's judgment is not the type of judgment that comes within TRIA's scope.  Under TRIA, a person has to: 1) obtain a judgment against a terrorist party; 2) on a claim based upon an act of terrorism or for which the terrorist party is not immune under FSIA, Section 1605(a)(7) of Title 28, United States Code;[45] 3) the assets must be "blocked

_____

[45]§1605(a)(7) has been deleted and replaced by Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008), § 1605A, Terrorism exception to the jurisdictional immunity of a foreign state. That section provides:

(a) In general.
(1) No immunity. A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.
(2) Claim heard. The court shall hear a claim under this section if--

(A)

(i) (I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or (II) in the case of an action that is re-filed under this section . . . the

assets" within the meaning of TRIA;[46] and 4) execution must seek only compensatory damages.[47]

*See* Terrorism Risk Insurance Act of 2002, Section 201(a).   This Memorandum Opinion will discuss these requirements in turn.

### 1. A judgment against a terrorist party on a claim based upon an act of terrorism or for which the terrorist party is not immune under FSIA 1605(a)(7)

The parties agree that Cuba has been designated a terrorist party for purposes of TRIA; thus, the first prong is satisfied because TRIA defines a terrorist party to include a state that has been "designated as a state sponsor of terrorism" by the Secretary of State and Cuba has been designated as such.  *See* Third- Parties' Opposition to Motion to Show Cause [52] at 21, n. 3 (*citing* 47 Fed. Reg. 16623-01 (Apr. 19, 1982)); Plaintiff's Reply in support of Motion to Show Cause [62] at 14.  To satisfy the second prong of TRIA, Plaintiff's claim must either be based upon an "act of terrorism" as that term is defined in TRIA at Section 201(d)(1), or an act for

---

foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) . . . was filed;
(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred--
    (I) a national of the United States;
    (II) a member of the armed forces; or
    (III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and
(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or
        *                    *                    *
[Section B and sub-sections Bb-Be are omitted.]

[46]"Blocked assets" are defined to exclude assets that are subject to a license.  TRIA, *supra.*, §201(d)(2)(B)(I).

[47]The Court notes that  Plaintiff's Writ of Attachment asks only for compensatory damages, not punitive damages.

which a terrorist party is not immune under FSIA 1605(a)(7).  As a preliminary matter, Plaintiff argues that a judgment against a foreign sovereign such as Cuba can be attached if the claim is based on an act of terrorism, whether the sovereign has immunity or not, while Movants argue that such interpretation is contrary to the intent of the act, which is to preserve sovereign immunity.  Movants assert that TRIA should be interpreted so that the "act of terrorism" prong applies to non-state actors. ([52] at 26, n.7.)  In support of this contention, Movants cite dicta from *Weininger* addressing the "act of terrorism" prong of TRIA as follows:

> "Act of terrorism" is defined [in TRIA] by reference to other statutes, and Plaintiffs suggest that they also have judgments based on an act of terrorism as defined in those statutes.  However, if a foreign sovereign was immune from judgment under
>
> § 1605(a)(7), reading "a claim based on an act of terrorism" to include those foreign sovereigns would defeat that very immunity and create a whole new category of jurisdiction over otherwise immune sovereigns.  This Court has before it no indication that this application reflects Congress's intent in passing TRIA, an execution statute.  It is possible that such language was designed to refer to terrorist acts by non-state actors, and not to state sponsors of terrorism such as Cuba.  Alternatively, the reference to "claims based upon an act of terrorism" may, as [the garnishee] suggests, be meant to authorize execution where the jurisdictional basis for the judgment to be enforced is a subsection of 28 U.S.C. §1605(a) other than 1605(a)(7).

462 F. Supp. 2d  at  480.

The Court need only determine the scope of the "act of terrorism" prong of TRIA if the Court finds that the tortious and torturous acts experienced by the Plaintiff in this matter fall within the definition of an "act of terrorism." An "act of terrorism" is alternatively defined to mean "(A) any act or event certified under section 102(1); or (B) to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii)))."  TRIA, *supra.*, Section 201(d).  TRIA, Section 102 (Definitions) states in relevant part that the term "act of terrorism" means:

> any act certified by the Secretary [of State] , . . ., and the Attorney General of the United

States - - (i) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to - - (I) human life; . . . (iii) to have resulted in damage within the United States, . . . and (iv) th have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

TRIA, Pub. L. 107-297, §102 (codified as a note to 15 USC §6701).

In the instant case, the torture and/or tortious acts experienced by Plaintiff were not acts that "resulted in damage within the United States" and they were not committed to coerce the United States population or influence United States policy. Nor do the actions described by Plaintiff to support his claim fall squarely within the definition of a "terrorist activity" (as set forth in the Immigration and Nationality Act), which includes any of the following:

(I) The highjacking or sabotage of any conveyance. . . . (II) The seizing or detaining, and threatening to kill, injure, . . ., another individual in order to compel a third person (including a government organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained. (III) A violent attack upon an internationally protected person . . . . (IV) An assassination. (V) The use of any - - (a) biological agent, chemical agent, or nuclear weapon or device, or (b) explosive, firearm . . . with intent to endanger, . . . the safety of one or more individuals or to cause substantial damage to property. (VI) A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. §1182 (a)(3)(B)(iii). Accordingly, this Court finds that the acts perpetrated against Plaintiff, albeit egregious, do not constitute "acts of terrorism" for purposes of TRIA and thus, whether or not these acts were committed by a state actor or non-state actor is not a critical inquiry because the Court has found that Plaintiff did not have a judgment on a claim based on an "act of terrorism" as that term is defined in TRIA.

To be eligible for a TRIA exception, the Plaintiff's judgment may alternatively be based upon a claim for which the terrorist party is not immune under FSIA 1605(a)(7), but in this case,

the Court has already determined that 1605(a)(7) is not applicable to Plaintiff's claim to provide

an exception to sovereign immunity.  As previously discussed, Section 1605(a)(7) states that (I)

a foreign state shall not be immune from jurisdiction of courts of the United States if the foreign

state was designated as a state sponsor of terrorism at the time the act occurred, or was so

designated *as a result of such act*, and (ii) the claimant or the victim was, at the time the act

occurred, a national of the United States; and (iii) in a case in which the act occurred in the

foreign state against which the claim has been brought, the claimant has afforded the foreign

state a reasonable opportunity to arbitrate the claim in accordance with the accepted international

rules of arbitration.  As noted earlier, Cuba was not designated a "state sponsor of terrorism"

until 1982, which is well after the acts sued upon herein occurred.  Nor was Plaintiff a United

States citizen at the time of the acts sued upon. Finally, § 1605(a)(7) is inapplicable because the

state court's default judgment made no finding that Jerez complied with the arbitration

requirement.[48]  Therefore, the judgment against Defendants may not be enforced by a writ of

attachment pursuant to TRIA, because neither alternative of the second prong of TRIA has been

satisfied.  The Court therefore does not have to determine whether or not the assets at issue here

are "blocked assets" pursuant to TRIA.[49]

---

[48]Movants did not place significant weight on the Section 1605(a)(7) arbitration
requirement.

[49]Jerez asserts that "TRIA has opened a wide range of blocked assets [including
intellectual property] to attachment and execution by the judgment creditors of state sponsors of
terrorism." *See* [25] at 51-52 (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659
F.Supp.2d 31, 58 (D.D.C. 2009); *see also Hegna v. Islamic Republic of Iran*, 376 F.3d 485, 487
(5th Cir. 2004) ("TRIA states that a successful plaintiff may attach and execute against the
'blocked assets' of terrorist parties.") (footnotes omitted)). Movants assert that because the
CACR allow the USPTO  to issue patent and trademark registrations to Cuban nationals,
trademarks and patents are not blocked, and further, the Movants' ability to protect and
prosecute any infringement on the patents or surrender the patents and trademark registrations at
any time  negates any suggestion that they are frozen or blocked. (Third-Parties' Reply in
support of Motion to Vacate [37] at 16; Hearing Transcript [82] at 67, lines 1-21.)

### B. Attaching Patents and Trademarks in General

In addition to the aforementioned challenges regarding jurisdiction and TRIA, Movants also contest Plaintiff's ability to attach trademarks (such as the Mark for Cuban cigars) on grounds that the transfer of a trademark would be impermissible in gross because it would transfer the trademark without the goodwill. *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984). In *Marshak*, the appellate court reversed an order authorizing the United States Marshal to attach and auction the judgment debtor's registered trademark because there was no transfer of goodwill with the auction. *See also Matter of GE Commercial Fin. Bus. Prop. Corp. v. Hakakian*, 13 Misc.3d 413, 417, 821 N.Y.S. 2d 391, 394, 2006 N.Y. slip op. 26324 (N.Y. Sup. Aug.15, 2006) (finding that a trademark cannot be assigned "in gross" apart from the business or goodwill with which the mark has been established and concluding that it would be improper to award the trademark outright)(citing *Marshak*, 746 F.2d 927); *Rogers v. Ercona Camera Corporation*, 277 F.2d 94, 101 (D.C. Cir. 1960) (with a seizure of a trademark in gross, there is no acquisition of property rights permitting exclusive use).

There are no rights in a trademark apart from the business with which the mark has been associated; thus, they are essentially inseparable. *Marshak v. Green*, 746 F.2d 927, 929; *see also* 15 U.S.C. §1060(a)(1) (stating that "[a] registered mark or a mark for which an application to register has been filed shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark.")[50]

---

[50]Movants further bolster their assertion that courts lack the power to seize or sell trademarks by relying on 15 U.S.C. § 1119 [power of courts over registration], which does not specifically mention the power to seize or sell but instead sets forth the powers of courts as follows:

In any action involving a registered mark[,] the court may determine the right to

Movants argue that an execution upon the certification marks would constitute fraud on consumers and would violate international agreements. More specifically, they contend that:

> The U.S. asserts that it discharges its international obligations to protect foreign "geographical indications," such as the Government Warranty Seal and HABANOS certification marks, as required by Article 22 of TRIPS [the Agreement on the Trade-Related aspects of Intellectual Property Rights] and the General Inter-American Convention for Trade Mark and Commercial Protection (the "IAC"), arts. 23-28, 46 Stat. 2907 (1930), by, *inter alia*, permitting foreign parties to register their certification marks pursuant to 15 U.S.C. section 1054.

( Third-Parties' Motion to Vacate [10] at 33.)

According to Movants, the United States would violate TRIPS and the IAC by "allowing the forced sale of ownership of the certification marks to a non-Cuban party, who cannot truthfully certify Cuban origin, and conversely, by preventing Cuban entities from protecting geographical indications." ([10] at 44.)[51]

In the instant case, Plaintiff acknowledged during the July 19, 2010 hearing that he has not asked for attachment or transfer of the Cuban government warranty seal on Cuban cigars but instead he has requested that this Court impose an equitable lien on the trademark. (Hearing Transcript [82] at 60, lines 10-22.) *See Adams Apple Distrib. Co. v. Papeleras Reunidas, S.A.,*

---

> registration, order the cancellation of registrations, . . . , restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. §1119.
Jerez contends that "Camara has not cited any cases that impose that limitation on the power of the Court under section 1119." (Plaintiff's Opposition to Camara's Motion to Vacate [65] at 13.)

[51]Specifically, Movants provide the following example as a blatant violation of international obligations - allowing a private party to affix to tobacco products a seal stating "REPUBLICA DE CUBA CUBAN GOVERNMENT"S WARRANTY FOR CIGARS EXPORTED FROM HAVANA" (Movants' Motion to Vacate [10] at 44-45.)

773 F.2d 925, 931 (7th Cir. 1995) (A court may place an equitable lien upon a trademark to secure a judgment because an equitable lien "does not seek to give the lienholder an in gross property right to the trademark itself.")[52]  *See also Cieslukowski v. Norton Motors*, No. CIV. 99-1056, 2002 WL 31045846, *5-6 (D. Minn. Sept. 10, 2002) (where the court issued a preliminary injunction preventing the defendants from transferring trademarks or any interest in the marks and imposed an equitable lien upon such trademarks so that plaintiff could secure his judgment).[53]

In response to the Court's question about how equitable liens are effected, (Hearing Transcript [82] at 60, lines 23-25; 61, line 1), Plaintiff's counsel elaborated that "[i]f there were to be value derived from that equitable lien, consistent with the status of the diplomatic relations between the countries and between the status of the embargo, there would be nothing at that point to preclude us from being able to capitalize on that." (Hearing Transcript [82] at 61, lines 2-12.)  Jerez argued that he intends to derive benefit from the Seal through "the sale of the Warranty Seal Trademark to a free Cuba, the licensing of the mark to a free Cuba, and/or securing deeming authority from a free Cuba to distribute the Warranty Seal in the United States in the same manner as private parties . . . ."  (Plaintiff's Reply in Support of Motion to Show

_____

[52]At the hearing, Movants argued they found "no authority under D.C. Law for that remedy to enforce a judgment [through an] equitable lien on a trademark."  (Hearing Transcript [82] at 90, lines 9-15.)  *See also* Camara's Reply in Support of its Motion to Vacate [68] at 28-29 & n. 7 (disputing that an equitable lien is a form of judicial relief under D.C. law and noting that the *Adams Apple* case involved a preexisting contractual relationship between the parties.)

[53] Movants distinguish *Cieslukowski* by arguing that the court in that case imposed an equitable lien to prevent fraudulent conveyances by a judgment debtor who had transferred assets to shell companies to defeat the satisfaction of a judgment, whereas in this case, there is "no threat of a fraudulent transfer [ ] to avoid the Jerez judgment." ([68] at 26, n.6.)

Cause [63] at 16.)[54] *Compare Rogers v. Ercona Camera Corp.*, 277 F.2d 94 (D.C. Cir. 1960) (recognizing that "the transfer of a trademark will not be deemed to be a transfer in gross if under the contract it appears that it was transferred for use in a business to be established and if it was so used" but finding that "at the time of seizure it was not possible to establish a business in which the mark could be used and none was established." )

Further, Jerez stated that the USPTO has a form, PTO-1594, which permits the holder of a security interest on a trademark to file a record of that interest. (See Plaintiff's Opposition to Camara's Motion to Vacate [65] at [65-1], Exh. A [copy of PTO form].) Counsel for Plaintiff indicated that this Court is being asked to "issue an order that says Mr. Jerez has a lien on the attached list of trademarks [and] [t]hat would then be filed with the Patent & Trademark Office, with the Department of Commerce, and so to the extent that there was any kind of transaction involving that trademark in the future, . . ., [the PTO] would have notice of [Plaintiff's] prior equitable interest in it." (Hearing Transcript [82] at 64, lines 10-21.)

In response to Plaintiff's argument that an equitable lien is an appropriate remedy, Movants argue that the "grant of an 'equitable lien' would be both meaningless and futile, and hence improper." (Camara's Reply in support of Motion to Vacate [68] at 25); *see Reality Income Trust v. Eckerd*, 564 F.2d 447, 458 (D.C. Cir. 1977)(courts will not grant equitable relief that is "vain or useless"). Movants assert that:

> Not only is the generation of funds from the sale or use of the Registration speculative in the extreme, it is a legal impossibility. The Registration cannot be transferred under the CACR (eliminating the possibility that proceeds could be diverted to Plaintiff). Nor

---

[54] Plaintiff's argument that he intends to sell the Mark to a "free Cuba" is not persuasive. If the present government of Cuba is in fact the assignee of record of the Mark, and the present government is succeeded by a "free Cuba" and given *de jure* status by the U.S. Government, the assignment of the Mark will most likely default to the new government.

could there be any sale even aside from the CACR, since both Cuban law and U.S. statutory and treaty law concerning intellectual property require that the Cuban Government own the mark. And there can be no income generated by use of the Registration , now or in the future. . . . Under Cuban law, the Seal must be applied to cigars *before they leave Cuba* and therefore, any fees for use of the Seal must be, and are, paid by Cuban exporters *in Cuba.*

([68] at 26) (emphasis in original) (citation omitted). This Court agrees that it cannot transfer the registration of the Mark under CACR.

In contrast to the equitable lien on trademarks, Plaintiff asserts that "with respect to patents, [Plaintiff is] essentially asking for a foreclosure . . . for those patents to be attached, and the ownership interest transferred to Mr. Jerez now, because you don't have any goodwill from any business as part of that." ( Hearing Transcript [82] at 65, lines 1-19.)  Plaintiff further argued that "there are also decisions saying that patents can be attached and used as security interests for loan, and transferred without respect to the rest of a business being transferred." (Hearing Transcript [82] at 66, lines 1-4.)   Movants do not contest that patents may be attached.  The Court, however, declines to enter a foreclosure of patents where such foreclosure requires the existence of a valid default judgment against the named Defendants and a finding that the writ of attachment is enforceable against the named Defendants as prerequisites to enforcement of a writ against the *agencies and instrumentalities* of such named Defendants, in order to attach intellectual property assigned to them.[55]

For the reasons set forth above, the Court finds that the Florida state court and the U.S. District Court for the Southern District of Florida lacked subject matter jurisdiction to issue their respective default judgments.  This Court, having *sua sponte* determined that both courts lacked

_____

[55]The Mark for Cuban cigars in the only intellectual property assigned to a named Defendant.

subject matter jurisdiction, declines to enforce their default judgments and vacates Plaintiff's

Writ of Attachment [58 ]. The Court further finds that the trademark for Cuban cigars is not

subject to an attachment or equitable lien. A separate Order will follow.[56]

DATED: March 28, 2011                    _____/s/_____
                                         ALAN KAY
                                         UNITED STATES MAGISTRATE JUDGE

---

[56]LCvR 72.2 (b) provides that "[a]ny party may file written objections to a magistrate judge's ruling under paragraph (a) within 14 days after being served with the order of the magistrate judge . . . ." That rule further states that "[t]he objections shall specifically designate the order or part thereof to which objection is made, and the basis for the objection." LCvR 72.2 (b).